

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-9-2000

# Jones, et al. v. Chemtron Corp.

Precedential or Non-Precedential:

Docket 99-3500

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Jones, et al. v. Chemtron Corp." (2000). *2000 Decisions.* Paper 94.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/94

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 9, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-3500

PHYLLIS JASKEY JONES; PAMELA JO SWANSINGER;
SANDRA JASKEY HUJARSKI; PATRICIA HUJARSKI;
JANICE JASKEY BUTVIN; FRANK BUTVIN; ROBERT
BUTVIN; BRIAN BUTVIN; SUSAN BUTVIN; WALTER
ANIELSKI; ARLENE VANS; YVONNE VANS BEKOSCKE;
ANTHONY VANS; GREGORY VANS; CAROL SCHULTZ;
MARY SCHAFFER; BRITTANY CULL; AMANDA
SCHAFFER; IVAN SCHAFFER; STEPHANIE SCHAFFER;
THERESA HUJARSKI ROSS,

       Appellants

v.

CHEMETRON CORPORATION

Appeal from the United States District Court
For the Western District of Pennsylvania
D.C. No.: 98-cv-01776
District Judge: Honorable Donald J. Lee

Argued: January 25, 2000

Before: GREENBERG, ROTH, and ROSENN,
Circuit Judges.

(Filed May 9, 2000)

Deborah J. Papushak, Esquire
(argued)
William Mitchell, Esquire
Armstrong, Mitchell, Damiani &
Zaccagnini
1725 The Midland Building
101 Prospect Avenue, West
Cleveland, OH 44115-1091

    Counsel for Appellants

Micah D. Green, Esquire (argued)
Richard Gurbst, Esquire
Adam R. Fox, Esquire
Squire, Sanders & Dempsey L.L.P.
4900 Key Tower
127 Public Square
Cleveland, OH 44114-1304

    Counsel for Appellee

OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal marks the second time this litigation has come before this court. It arises out of a bankruptcy proceeding that began when Chemetron Corporationfiled a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Western District of Pennsylvania in early 1988. The bankruptcy court confirmed Chemetron's bankruptcy reorganization plan on July 12, 1990. On March 2, 1992, Phyllis Jaskey Jones and fourteen other persons filed a state law tort action in the Court of Common Pleas of Cuyahoga County, Ohio ("the Cleveland Action") seeking monetary damages and other relief for injuries allegedly sustained from exposure to radioactive and other toxic and hazardous substances Chemetron deposited at the Bert Avenue dump, a site located in their residential neighborhood of Newburgh Heights, Ohio. The suit was later amended to name a total of twenty-one plaintiffs. Chemetron moved to dismiss that action on the ground that the bankruptcy court had

2

retained jurisdiction over the issues presented when it confirmed the reorganization plan.

The parties agreed to stay the Cleveland Action, and the plaintiffs filed a motion in the bankruptcy court to allow their late-filed claims, or alternatively for an adversarial proceeding to determine that their claims had not been discharged by the bankruptcy confirmation order. At the time they filed their motion, the plaintiffs were scattered across Ohio and as far away as Texas. In support of their motion to permit late-filing, the plaintiffs argued that they had not been provided with sufficient notice of the bankruptcy proceeding, and that they were unaware that their illnesses were the result of Chemetron's conduct at the time Chemetron filed for bankruptcy. In support of their request for a determination of nondischargeability, the plaintiffs contended that their claims had accrued after the confirmation of Chemetron's bankruptcy reorganization plan.

The bankruptcy court agreed that the plaintiffs had received inadequate notice, and permitted the latefiling. In re Allegheny Int'l, Inc. (Jones v. Chemetron Corp.), 158 B.R. 356 (Bankr. W.D. Pa. 1993). The United States District Court reversed. 170 B.R. 83 (W.D. Pa. 1994). The appeal came to this court, which ruled that the plaintiffs had received sufficient notice of the bankruptcy proceeding. We remanded to the bankruptcy court, however, to determine whether the plaintiffs should still be permitted tofile their claims based on excusable neglect pursuant to Bankruptcy Rule 9006(1). Chemetron Corp. v. Jones, 72 F.3d 341 (3d Cir. 1995), cert. denied, 517 U.S. 1137 (1996) [hereinafter Chemetron I].

On remand, the bankruptcy court held, by opinion and order dated September 14, 1998, that the plaintiffs had failed to demonstrate excusable neglect. Turning to their motion for an adversarial proceeding, the court held that the plaintiffs' claims had accrued prior to the bar date and to the 1990 confirmation of Chemetron's reorganization plan; they therefore were discharged by the court's confirmation order. The district court affirmed by

3

memorandum opinion dated May 18, 1999. This timely appeal followed.[1] We affirm in part and reverse in part.

I.

The underlying facts are set forth in this court's prior opinion in this case, and need only be summarized here. Beginning in 1965, appellee Chemetron Corporation ("Chemetron") owned and operated a manufacturing facility on Harvard Avenue in Cuyahoga Heights, Ohio, as well as a nearby landfill on Bert Avenue in Newburgh Heights, Ohio. From 1965 to 1972, Chemetron employed a manufacturing process at the Harvard Avenue facility that utilized depleted uranium. After Chemetron ceased to use this process, it demolished a portion of its Harvard Avenue facility and placed a quantity of rubble from the demolition in the Bert Avenue landfill.[2] This rubble was apparently contaminated due to radiation exposure.

Between 1980 and 1988, Chemetron was involved in periodic clean-up efforts at both the Harvard Avenue and Bert Avenue sites at the direction of the Nuclear Regulatory Commission ("NRC"), with some involvement by the federal and Ohio Environmental Protection Agencies. The presence of hazardous materials at the Bert Avenue dump and these efforts to clean up the area received considerable local attention beginning shortly after its discovery in 1980. The local press reported on these cleanup efforts for the next decade. Town meetings were held in which environmental officials explained the situation to area residents. A community watchdog group formed that distributed a questionnaire to everyone in the neighborhood requesting information about contact with the dump and medical conditions suffered. The mayor's office sent out a newsletter in 1980 noting concern about the contamination. As early

_____

1. The bankruptcy court had subject matter jurisdiction pursuant to 28 U.S.C. S 157. The district court had appellate jurisdiction pursuant to 28 U.S.C. S 158(a). This court has appellate jurisdiction pursuant to 28 U.S.C. S 158(d).

2. Later in 1975, Chemetron sold both sites to McGean Chemical Company. McGean Chemical Co. subsequently merged with Rohco, Inc., to become McGean-Rohco, Inc., the current owner of both sites.

4

as 1980, another resident in the area filed a lawsuit against Chemetron charging that the presence of hazardous materials at the Bert Avenue dump was responsible for her daughter's health problems.

For the next decade, cleanup efforts persisted, but as this court noted in its earlier decision in this case, these efforts were of "dubious" efficacy. Chemetron I , 72 F.3d at 344. By 1990, local attention swelled again, recognizing that the contamination danger persisted. Although press accounts were at times ambiguous concerning the severity of the danger presented by the Bert Avenue dump, some articles reported that several families in the neighborhood were suffering adverse health effects.

On February 20, 1988, Chemetron filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. Following Bankruptcy Rule 3003(c)(3), the bankruptcy court issued a bar date order, fixing the claims bar date at May 31, 1988. Under bankruptcy law, the bar date is the last day on which existing claims can be filed against the debtor. The bar date order required that actual notice be provided to all persons known to have claims against the debtors. The order required notice to all other claimants by publication in the national editions of the New York Times and Wall Street Journal. Chemetron complied with the order and, in addition, voluntarily published notice in seven other newspapers in areas where it was doing business at the time of the filing. On July 12, 1990, the bankruptcy court confirmed Chemetron's reorganization plan.

Nevertheless, Jones and the other plaintiffs assert in affidavits that they were unaware of the degree of risk posed to their health and safety by the contaminated site until after reading about a 1991 federal lawsuitfiled against Chemetron in Cleveland by other local residents. Only then, the plaintiffs assert, did they contact lawyers, who proceeded to gather their medical records, have these records analyzed by physicians, and subsequently report to the plaintiffs that their health problems resulted from the contamination.

In March 1992, almost four years after the claims bar date and twelve years after the first newspaper articles

reported on contamination at the sites, Phyllis Jones and ultimately twenty other individuals brought suit against Chemetron, McGean Chemical Co., and McGean–Rohco, Inc., in the Court of Common Pleas of Cuyahoga County, Ohio. The gravamen of the complaint alleged injury from exposure to toxic chemicals as a result of time spent living in or visiting the Bert Avenue area.

Of the twenty-one plaintiffs, one, Ivan Schaffer, was born on August 27, 1992, more than two years after the bankruptcy court confirmed Chemetron's plan of reorganization.

II.

We first discuss the plaintiffs' claim that the bankruptcy court erred in concluding that they failed to demonstrate excusable neglect. Next, we address their argument that the bankruptcy court erred in finding that their claims arose prior to the confirmation of Chemetron's bankruptcy reorganization plan. Finally, we revisit the issue of notice with regard to one of the plaintiffs.

A.

On remand from this court's decision in Chemetron I, the plaintiffs argued that the bankruptcy court should permit them to file their claims late because their failure to file prior to the May 31, 1998 bar date was attributable to excusable neglect.[3] The district court affirmed the bankruptcy court's ruling that the plaintiffs failed to demonstrate excusable neglect under the test enunciated in Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership, 507 U.S. 380, 395 (1993). [4] It

_____

3. Federal Rule of Bankruptcy Procedure 9006(b)(1) provides:

> [W]hen an act is required or allowed to be done at or within a
> specified period by these rules or by a notice given thereunder or by
> order of court, the court for cause shown may at any time in its
> discretion . . . on motion made after the expiration of the specified
> period permit the act to be done where the failure to act was the
> result of excusable neglect.

4. Under this test, to show "excusable neglect" sufficient to waive the requirement that all bankruptcy claims be filed by the bar date, a

concluded that to allow the plaintiffs to proceed with claims potentially amounting to $36 million four years after Chemetron's bankruptcy petition was filed and two years after its reorganization plan was confirmed "would cause disruption to the bankruptcy process that has already taken place," and therefore would cause extreme prejudice to the debtor." (Bankr. Op. at 7). It further noted that "the length of delay in this case was significant," and that the plaintiffs did not contest this. (Bankr. Op. at 8). The court also concluded that there is no evidence of bad faith on the part of the plaintiffs. (Bankr. Op. at 15). Finally, the court rejected the plaintiffs' arguments (1) that Chemetron's prepetition actions contributed to their delay infiling their claim, by Chemetron's misrepresentation of the danger present at the Bert Avenue dump to the relevant government agencies and to the public (Bankr. Op. at 9); (2) that the investigating agencies failed to adequately investigate or independently follow up with Chemetron's clean-up efforts; and (3) that newspaper accounts inaccurately reported the extent of the contamination, and failed to warn the community that residents could suffer physical harm from the exposure.

The bankruptcy court made the following pertinent findings:

> [Chemetron's cleanup] efforts were not satisfactory according to reports by the NRC. However, in the summer and early fall of 1980, several newspaper articles were published in the Cleveland Plain Dealer and Cleveland Press regarding the contamination and the concerns expressed by the residents of the area. Specifically, articles appeared in the Cleveland Plain Dealer on 7/9/80, 9/5/80, 9/10/80, 9/12/80, 11/21/80 and 11/21/80. The Cleveland Press also had an article on July 8, 1980. In particular, one article

_____

bankruptcy court must make an equitable inquiry into the totality of the relevant circumstances. Relevant circumstances to be considered include (1) the danger of prejudice to the debtor, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in good faith. Id.

reported on a town meeting held in September of 1980 to address residents concerns about the levels of radiation in the area. The article indicated that six members of the Nuclear Regulatory Commission as well as approximately 80 people from the community were in attendance. The residents were informed that while levels of radiation were present on the Chemetron and McGean properties, the levels were not high enough to cause harm.

In addition to the potential dangers being reported in the newspapers, members of the community organized and formed the Concerned Citizens of Newburgh Heights. This association prepared and distributed a community health survey which stated that the citizens were working to remove the danger of hazardous waste from the community.

Several investigative and administrative agencies were involved in the assessment and cleanup efforts in conjunction with the NRC including the U.S. Environmental Protection Agency ("EPA"), the Ohio Environmental Protection Agency and the Ohio Health Department. A Congresswoman made inquiry and follow up inquiry to the federal EPA in the fall of 1980 into 1981. There was awareness of the site and attention focused on it by at least 1980. This level of awareness and inquiry does not support plaintiffs contention that misrepresentations by Chemetron hindered them from learning the necessary information.

(Bankr. Op. at 11–12). Based on these findings, the court further found "that the toxic site was well known in the community." (Bankr. Op. at 12).

Moreover, the court found that even assuming Chemetron did mislead or provide inadequate information regarding the contamination to the community, the plaintiffs failed to adequately investigate the situation themselves, a factor wholly within their control. Specifically, the court noted that "[n]ot one of [the plaintiffs'] affidavits indicates what efforts had been made through the course of plaintiffs' medical history to determine the cause of their

8

injuries until they learned of the class action suitfiled by the other residents . . . [,] despite the fact that certain affidavits state that the families had serious health problems." (Bankr. Op. at 14). Moreover, the court noted that "nothing in the record[ ] . . . suggest[s] that plaintiffs sought information from Chemetron which may have assisted them in their determination which was denied." (Bankr. Op. at 14-15).

We must accept the bankruptcy court's factual determinations unless clearly erroneous. See Fed. R. Bankr. P. 8013. Our review of issues of pure law, or mixed questions of law and fact, is plenary. See Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 642 (3d Cir. 1991), cert. denied, 503 U.S. 937 (1992). We review the bankruptcy court's ultimate determination regarding the existence of excusable neglect for abuse of discretion. See In re Vertientes, Ltd., 845 F.2d 57, 59 (3d Cir. 1988).

On appeal, the plaintiffs contend that the bankruptcy court imposed an "unreasonable burden" on them because they had no way of knowing that they had a claim against Chemetron prior to the 1988 bar date, and therefore the delay was beyond their control. The burden of proving excusable neglect lies with the late-claimant. See In re Trump Taj Mahal Assoc., 156 B.R. 928, 936 (Bankr. D.N.J. 1993), aff 'd, Civ. A. No. 93-3571, 1993 WL 534494, at *5 (D.N.J. Dec. 13, 1993).5 Moreover, "[i]gnorance of one's own claim does not constitute excusable neglect." In re Best Prods. Co., Inc., 140 B.R. 353, 359 (Bankr. S.D.N.Y. 1992), cited with approval in In re Trans World Airlines, Inc., 96 F.3d 687, 690 (3d Cir. 1996).

We conclude that the determinations of the bankruptcy court that contamination generally was known in the community in the early 1980's, and that some residents publicly expressed concern about the health effects of these toxins in press accounts and at public meetings, are

_____

5. The plaintiffs, relying on cases involving motions for summary judgment, suggest that the bankruptcy court should have viewed the facts in a light more favorable to them. This case does not involve summary judgment, however, and therefore the bankruptcy court properly placed the burden on the plaintiffs.

supported by the record. Moreover, as discussed in greater detail in Part II.B. below, the record supports the court's observation that the plaintiffs introduced no evidence to show what measures they took to specifically investigate the cause of their medical problems. Therefore, these findings are not clearly erroneous.[6]

Accordingly, the bankruptcy court committed no abuse of its discretion in holding that the plaintiffs have failed to sustain their burden of proving excusable neglect. The prejudice to the "fresh start" to which Chemetron was entitled as a result of the Chapter 11 reorganization, the delay of four years after the bar date and two years after the confirmation date before the plaintiffs brought their claim, and their failure to specifically investigate the cause of their illnesses, even though the danger from the Bert Avenue dump generally was known in the community, combine to defeat their request that they be permitted to file late claims.

B.

The plaintiffs also filed a motion for an adversarial proceeding requesting a determination by the bankruptcy court that even absent excusable neglect, their claims arose after the confirmation of Chemetron's bankruptcy reorganization plan. Therefore, their Cleveland Action was unaffected by the earlier bankruptcy proceeding.

The parties dispute the correct standard for determining when the plaintiffs' claims arose. Chemetron contends that the question of when the plaintiffs' claims arose is not governed by state law dictating when a cause of action

_____

6. The plaintiffs make an additional argument that the bankruptcy court should have concluded that their failure to file claims prior to the bar date was excusable because they are insufficiently sophisticated to know that they might have claims against Chemetron. (Appellants' Br. at 31–32). However, the plaintiffs' degree of sophistication is an issue that is relevant to the adequacy of the notice of bankruptcy proceedings they received, In re Grand Union Co., 204 B.R. 864, 872, 880 (Bankr. D. Del. 1997), not to the issue of excusable neglect. The adequacy of notice in this case was (with one exception, discussed infra at note 14) conclusively decided by this court in Chemetron I.

10

accrues, but rather by a federal common law of
bankruptcy. Although significant authority supporting this
proposition exists in other circuits, this circuit has held the
reverse. In Matter of Frenville Co., Inc., 744 F.2d 332 (3d
Cir. 1984), cert. denied, 469 U.S. 1160 (1985), this court
held that in most circumstances a "claim" arises for
bankruptcy purposes at the same time the underlying state
law cause of action accrues. Id. at 337. We are cognizant of
the criticism the Frenville decision has engendered,7 but it
remains the law of this circuit. See Matter of Penn Central
Transp. Co., 71 F.3d 1113, 1114–15 (3d Cir. 1995) (applying
rule of Frenville), cert. denied, 517 U.S. 1221 (1996); In re
Bryer, 216 B.R. 755, 759 (Bankr. E.D. Pa. 1998) (same).
Accordingly, this court must look to Ohio tort law to
determine when the plaintiffs' claims accrued.

The Ohio Supreme Court has held that where an injury
is latent, the "discovery rule" dictates that a cause of action
based on that injury accrues, for statute of limitations
purposes, when the injury is manifest and when the injured
party knows or has reason to know the cause of the injury.
Liddell v. SCA Servs. of Ohio, Inc., 635 N.E.2d 1233, 1237–
39 (Ohio 1994); O'Stricker v. Jim Walter Corp. , 447 N.E.2d
727, 732 (Ohio 1983). That court, however, has never
addressed whether knowledge of causation is required even
where an injury is manifest, i.e., where the plaintiff is
aware of actual physical harm. Ohio law is not particularly
clear on this issue.

Nevertheless, several Ohio courts have held that some
_____

7. See, e.g., Epstein v. Official Comm. of Unsecured Creditors of Estate
of
Piper Aircraft Corp., 58 F.3d 1573, 1576 n.2 (11th Cir. 1995); Grady v.
A.H. Robins Co., Inc., 839 F.2d 198, 201–02 (4th Cir.), cert. dismissed
sub nom. Joynes v. A.H. Robins Co, Inc., 487 U.S. 1260 (1988); In re
Black, 70 B.R. 645, 648–51 (Bankr. D. Utah 1986); Acevedo v. Van Dorn
Plastic Machinery Co., 68 B.R. 495, 497–98 (Bankr. E.D.N.Y.1986); In re
Johns–Manville Corp., 57 B.R. 680, 688–90 (Bankr. S.D.N.Y. 1986); In re
Edge, 60 B.R. 690, 701–05 & n.13 (Bankr. M.D. Tenn. 1986); In re
Yanks, 49 B.R. 56, 57–59 (Bankr. S.D. Fla. 1985); In re Baldwin–United
Corp., 48 B.R. 901, 903 (Bankr. S.D. Ohio 1985); Ralph R. Mabey &
Annette W. Jarvis, In re Frenville: A Critique by the Nat'l Bankruptcy
Conference's Comm. on Claims & Distributions, 42 Bus. Law. 697, 703–14
(1987).

11

knowledge of the relationship between the putative plaintiff 's injury and the illegal conduct responsible for that injury is required for a cause of action to accrue (although they disagree about the required degree of knowledge regarding how proximately the injury resulted from the defendant's conduct). Barker v. A.H. Robins Co. , No. 84AP-297, 1985 WL 9826 (Ohio Ct. App. Jan. 17, 1985), an unpublished decision of the Court of Appeals of Ohio, is most directly on point. There, the plaintiff brought an action to recover damages for an infection requiring removal of her left ovary, resulting from her use of defendant's intra-uterine device. The trial court dismissed the complaint on statute of limitations grounds. Interpreting Ohio precedent, the Court of Appeals held that application of the "discovery rule" in all cases of bodily injury requires a determination as to when the plaintiff knew or should have known of the "causal relationship" between the defendant's actions and her injuries. Id. at *5-6. In so holding, the court expressly rejected the notion that the knowledge of causation required by cases like O'Stricker was limited to situations in which the plaintiff 's injuries were latent. Id.8

Apparently assuming without deciding that such a rule applied, the bankruptcy court found that the plaintiffs had

_____

8. Ohio statutes also provide for application of the discovery rule to various torts. Most relevant here is Ohio Revised Code S 2305.10, which states:

    (A) . . . [A]n action . . . for bodily injury . . . shall be brought within
    two years after the cause of action accrues. Except as provided in
    divisions (B)(1) to (4) of this section, a cause of action accrues under
    this division when the injury . . . occurs.

    (B)(1) For purposes of division (A) of this section, a cause of action
    for bodily injury . . . that is caused by exposure to hazardous or
    toxic chemicals . . . accrues upon the date on which the plaintiff is
    informed by competent medical authority that the plaintiff has an
    injury that is related to the exposure, or upon the date on which by
    the exercise of reasonable diligence the plaintiff should have known
    that the plaintiff has an injury that is related to the exposure,
    whichever date occurs first.

Ohio Rev. Code Ann. S 2305.10 (emphasis added).

failed to present evidence to show that they satisfied their duty to investigate the cause of their manifest injuries. Specifically, the court noted that the record amply demonstrated that other residents in the Newburgh Heights community were aware of the existence of harmful substances at the Bert Avenue dump prior to 1990. (Bankr. Op. at 21-23). The bankruptcy court also found it significant that one neighborhood resident, Barbara Looby, had made inquiry into a connection between medical conditions and exposure to toxins present at the dump as early as 1980. (Bankr. Op. at 22). The court found that there was no reason

> that competent medical authority was unable to make the appropriate diagnosis. There is nothing to suggest that the medical community at the time did not have the knowledge or necessary scientific evidence to determine medical conditions resulting from toxic exposure.

(Bankr. Op. at 22). Accordingly, the bankruptcy court determined that had the plaintiffs undertaken a reasonable investigation of the cause of their manifest injuries, they would have discovered this potential cause, and their causes of action would have arisen prior to thefiling of Chemetron's bankruptcy petition. Consequently, the court held their claims were discharged by the 1990 confirmation order.

On appeal, the plaintiffs contend that the bankruptcy court's factual findings were clearly erroneous. Specifically, they contend that the court erred in finding that they failed to investigate the cause of their injuries. In support of this contention, however, the plaintiffs primarily argue that notwithstanding press accounts, community meetings and newsletters from the mayor's office, they personally were unaware of the danger posed by the dump. Moreover, they claim that Chemetron contributed to their obliviousness because it knew what chemicals were present at the dump, but lied to the community about it.

As the bankruptcy court observed, the Ohio Supreme Court has superimposed on the "discovery rule" a "reasonable investigation" requirement, which essentially

13

acts to end the tolling of the statute of limitations prior to actual discovery of the nature and cause of a putative plaintiff 's injury at the time he or she should have discovered this information through the exercise of reasonable diligence. See Flowers v. Walker, 589 N.E.2d 1284, 1288-89 (Ohio 1992);9 see also Ohio Rev. Code Ann. S 2305.10 (cause of action may accrue "upon the date on which by exercise of reasonable diligence the plaintiff should have known that the plaintiff has an injury that is related to the exposure"). Even the U.S. Supreme Court has recognized the importance of a policy requiring prospective plaintiffs to "initiate a prompt inquiry" regarding a negligence cause of action. United States v. Kubrick, 444 U.S. 111, 118, 122 (1979) (addressing accrual of claim under Federal Tort Claims Act); see also Zeleznik v. United States, 770 F.2d 20, 22-23 (3d Cir. 1985), cert. denied, 475 U.S. 1108 (1986). Accordingly, we now turn to an analysis of whether the plaintiffs satisfied this diligence requirement.

In their brief to this court and at oral argument, the plaintiffs have made reference to their repeated visits to their treating physicians.10 Notwithstanding these

_____

9. Flowers was a medical malpractice case, which was governed by a one year statute of limitations. The court noted that in Ohio, the "discovery rule" had been judicially imposed in determining when such actions accrue. Id. at 1287. The court then held that "[a] plaintiff need not have discovered all the relevant facts necessary to file a claim in order to trigger the statute of limitations. . . . Rather, the `cognizable event' itself
puts the plaintiff on notice to investigate the facts and circumstances relevant to her claim in order to pursue her remedies." Id. at 1287-88. The court further held "the identity of the practitioner who committed the alleged malpractice is one of the facts that the plaintiff must investigate, and discover, once she has reason to believe that she is a victim of medical malpractice." Id. at 1288. There is no reason to believe the Ohio Supreme Court would not impose a similar diligence requirement in a toxic tort case such as this. See also supra note 8 (quoting Ohio Rev. Stat. Ann. S 2305.10).

10. The plaintiffs assert that the bankruptcy court "placed an unreasonable burden upon [them] to have greater knowledge than their physicians or the regulatory agencies which were involved in investigating the site." (Appellants' Br. at 27, 32). They contend:

    [T]he Appellants in this case had no reason to question their
    physicians about the possibility that their illnesses might have
been

14

assertions, however, there is no evidence at all on this record that thirteen of the twenty-one plaintiffs even visited doctors to determine the cause of their medical problems.

Seventeen of the plaintiffs in this case submitted affidavits in support of their filings in the bankruptcy court. Four of these affidavits imply, without stating directly, that the affiants had been to see doctors about their health problems. These affidavits include the following language:

> During the process of gathering medical information [for evaluation for this lawsuit], and in the normal course of my continuing treatment for various medical problems, I informed my treating physicians and nurses of the investigations our attorneys were conducting relating to the radioactive substances and chemicals. While none of those physicians made any statements to me as to the relationships between my medical problems and these substances and chemicals, they were all extremely interested.

_____

> caused by their exposure to radiation and hazardous substances at the Toxic Sites. When Appellants finally acquired the suspicion that their illnesses were caused by such exposure, their treating physicians still did not express an opinion that linked their illnesses to the exposure.
>
> *   *   *
>
> The fact is -- these Appellants knew what their doctors told them, and were reasonable in relying upon those statements until they were told otherwise by competent medical authority.

(Appellants' Br. at 42 (emphasis in original)). Finally, they state:

> Even when Appellants' treating physicians were asked about a connection between their exposure to Toxic Sites and their injuries, their treating physicians did not identify a connection.
>
> *   *   *
>
> The Appellants in this proceeding have regularly seen physicians for treatment of their injuries, but were never advised by their physicians of a causal connection between their exposure to the Toxic Sites and their illnesses.

(Appellants' Br. at 47).

(Appendix at B-496 (affidavit of Phyllis Jones), B-509 (affidavit of Janice Jaskey Butvin), B-525 (affidavit of Arlene Vans), B-538 (affidavit of Sandra Jaskey Hujarski)). One additional affidavit states "for years my daughters and I had been suffering from numerous health problems for which our doctors had been unable to find a cause." (Appendix at B-499 (affidavit of Mary Schaffer 11). These affidavits, which at most indicate that only seven of the plaintiffs even went to see a physician about their medical problems,12 constitute the only evidence offered by the plaintiffs of efforts they took to determine the cause of their injuries. However, this vague evidence does not indicate when these seven plaintiffs first made attempts to see physicians or what other efforts they made to determine the cause of their injuries in a timely manner.

Accordingly, with regard to twenty of the twenty-one plaintiffs, the bankruptcy court's finding that these plaintiffs failed to diligently investigate the cause of their injuries is not clearly erroneous. Its holding that these plaintiffs' claims were discharged by the 1990 confirmation order is therefore affirmed.

C.

We note, however, that one of the plaintiffs, Ivan Schaffer, was not born until August 27, 1992, more than two years after the bankruptcy court confirmed Chemetron's plan of reorganization. We believe his situation merits separate discussion.

Under Chapter 11 of the Bankruptcy Code, "the confirmation of a plan . . . discharges the debtor from any debt that arose before the date of such confirmation." 11 U.S.C. S 1141(d)(1)(A). Thus, in most circumstances, "confirmation of the debtor's reorganization plan discharges all prior claims against the debtor." Chemetron I, 72 F.3d at

_____

11. Mary Schaffer's daughters are Amanda and Stephanie Schaffer, both plaintiffs to this action.

12. These are Phyllis Jones, Janice Jaskey Butvin, Arlene Vans, Sandra Jaskey Hujarski, Mary Schaffer, Amanda Schaffer and Stephanie Schaffer.

16

346.[13] However, if a potential claimant lacks sufficient notice of a bankruptcy proceeding, due process considerations dictate that his or her claim cannot be discharged by a confirmation order. In re Trans World Airlines, Inc., 96 F.3d 687, 689-90 (3d Cir. 1996); Chemetron I, 72 F.3d at 346; In re Harbor Tank Storage Co., 385 F.2d 111, 115-16 (3d Cir. 1967).

Such due process considerations are often addressed by the appointment of a representative to receive notice for and represent the interests of a group of unknown creditors. See, e.g., Hatch v. Riggs Nat'l Bank, 361 F.2d 559, 566 (D.C. Cir. 1966); In re Piper Aircraft Corp., 168 B.R. 434, 436, 440 & n.12 (S.D. Fla. 1994), aff 'd, 58 F.3d 1573 (11th Cir. 1995). In In re Amatex, 755 F.2d 1034 (3d Cir. 1985), this court held that a representative could be appointed to represent the interests of future unknown asbestos claimants in bankruptcy reorganization proceedings because such claimants are "sufficiently affected by the reorganization proceedings" as to require some voice in them and therefore qualify as "parties in interest" under 11 U.S.C. S 1109(b). Id. at 1041-43. Accord In re Forty-Eight Insulations, Inc., 58 B.R. 476, 477 (Bankr. N.D. Ill. 1986); In re UNR Indus., Inc., 46 B.R. 671, 675 (Bankr. N.D. Ill. 1985); In re Johns-Manville Corp., 36 B.R. 743, 747-49 (Bankr. S.D.N.Y. 1984). The Amatex court did not decide whether future claimants are "creditors" who possess "claims" that may be discharged by a bankruptcy confirmation order. Id. at 1043. We need not reach this issue, however, because in the instant case there exists a more fundamental problem. Ivan Schaffer cannot be deemed to have received adequate notice of Chemetron's

_____

13. See also Epstein v. Official Comm. of Unsecured Creditors of Estate of Piper Aircraft Corp., 58 F.3d 1573, 1576, 1577 (11th Cir. 1995); In re Christopher, 28 F.3d 512, 515 (5th Cir. 1994); In re Waterman S.S. Corp., 157 B.R. 220, 221 (S.D.N.Y. 1993); In re The Charter Co., 113 B.R. 725, 728 (M.D. Fla. 1990); In re Eagle-Picher Indus., Inc., 216 B.R. 611, 615 (Bankr. S.D. Ohio 1997); In re Nevada Emergency Servs., Inc., 39 B.R. 859, 861, 862 n.4 (Bankr. D. Nev. 1984).

Chapter 11 bankruptcy proceeding, because no effort was made to address his potential claims in that proceeding.14

Where no action is taken to address the interests of unborn future claimants in a Chapter 11 bankruptcy reorganization proceeding, the reorganized former debtor cannot later avoid liability to such claimants by arguing that their claims were discharged in bankruptcy. Under fundamental notions of procedural due process, a claimant who has no appropriate notice of a bankruptcy reorganization cannot have his claim extinguished in a settlement pursuant thereto. See, e.g. , Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314-19 (1950); Chemetron I, 72 F.3d at 346; In re Savage Indus., Inc., 43 F.3d 714, 721 (1st Cir. 1994). Here, Ivan Schaffer had no notice of or participation in the Chemetron reorganization plan. No effort was made during the course of the bankruptcy proceeding to have a representative appointed to receive notice for and represent the interests of future claimants. Therefore, whatever claim Ivan Schaffer may now have was not subject to the bankruptcy court's bar date order, Conway v. White Trucks, 885 F.2d 90, 97 (3d Cir. 1989), and was not discharged by that court's confirmation order.

Chemetron contends that as a future claimant, Ivan Schaffer had sufficient notice of the bankruptcy proceeding because his mother, also a plaintiff to this action, had notice of the proceeding and was qualified to act as guardian for her unborn children. Although we do not dispute that a parent can represent the interests of her minor children, because of the imponderables involved, we do not believe the law imposes a duty upon a parent to take action to protect a potential claim of a child not yet conceived or born. Nor do we believe that in a Chapter 11 reorganization, a bankruptcy court is obligated sua sponte to appoint a representative to deal with future interests if

_____

14. In Chemetron I, we held that the plaintiffs had received sufficient notice of the bankruptcy proceedings. However, it is apparent from the face of that decision that this court did not consider the specific question
of whether sufficient notice was provided to unborn future claimant Ivan Schaffer. Therefore, that decision does not bind us as to this issue.

no request is made. See Locks v. United States Trustee, 157 B.R. 89, 95–99 (W.D. Pa. 1993); cf. In re Chicago, Rock Island & Pac. R.R. Co., 788 F.2d 1280, 1282 (7th Cir. 1986) (holding the Fed. R. Civ. P. 17(c) does not impose on federal courts duty to appoint guardians for all potential litigants who cannot represent themselves).15 Such a duty would impose an enormous and unreasonable responsibility of prescience on the courts. Accordingly, we hold that the potential claim of an unborn child not represented in bankruptcy reorganization proceedings is not discharged by a confirmation order.

III.

Conclusion

For the foregoing reasons, the judgment of the district court will be affirmed except as to plaintiff Ivan Schaffer. As to Ivan Schaffer, the May 18, 1999 order of the district court will be reversed and the case remanded with instructions to direct the bankruptcy court to issue a declaration that his potential claim was not discharged by the July 12, 1990 confirmation order. Each side to bear its own costs.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

_____

15. We do not address whether such appointment is mandatory in bankruptcy liquidation proceedings. Compare Forty-Eight Insulations, 58 B.R. at 477 (appointing futures representative in liquidation proceeding because after debtor-entity dissolves, future claimants will have no recourse) with Locks, 157 B.R. at 96 (appointment of futures representative in liquidation proceeding unnecessary).

19